# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMAHL RICE,                              *

Plaintiff                                 *

v                                         *          Civil Action No. RDB-18-600

DR. ASHRAH, *et al.*                      *

Defendants                                *
                                       ***

## MEMORANDUM OPINION

Self-represented plaintiff Jamahl Rice filed the above-captioned civil rights action alleging that Defendants have been deliberately indifferent to his medical needs. ECF No. 1. Three of the four Defendants[1] have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, and Plaintiff has responded. ECF Nos. 16, 25. Defendants have also filed a Supplemental Motion to Dismiss. ECF No. 32.

The matter is now ripe for review. The Court finds a hearing in these matters unnecessary. *See* Local Rule 105.6. For the reasons that follow, Defendants' dispositive Motion, construed as a Motion for Summary Judgment, is GRANTED. Defendants' Supplemental Motion for Summary Judgment is terminated as moot.

---

[1] The other Defendant, identified by Plaintiff only as "x-ray radiologist" (ECF No. 1 at 1), was not able to be served given the lack of information Plaintiff provided about this individual. In any event, the allegations in the Complaint fail to articulate a claim against the "x-ray radiologist." *See* ECF No. 1 at 4-5 (stating that Dr. Ashraf sent Plaintiff to get an x-ray on January 16, 2018, that Plaintiff received the x-ray, and that three days later "[t]he doctor told me he saw it said 'no change.'"). For the first time in his Response in Opposition, Plaintiff states that the "x-ray radiologist was incorrect" in saying that Plaintiff did not have a dislocated shoulder based on his or her reading of the January 15, 2018 x-ray, because an x-ray taken two months later at the hospital determined that the shoulder was dislocated. ECF No. 25 at 4-5. Assuming that this is the basis of Plaintiff's claim against the x-ray radiologist, it does not amount to a prima facie legal claim. Setting aside the unacknowledged possibility that Plaintiff's shoulder was not fully dislocated in January but became dislocated during the two months before he went to the hospital, the claim fails because Plaintiff fails to does not suggest that this erroneous reading amounted to malpractice, much less that radiologist acted with the requisite mental state to support a constitutional claim of deliberate indifference. Accordingly, the x-ray radiologist shall be dismissed from this action.

# BACKGROUND

## A. Plaintiff's Complaint

Plaintiff, an inmate housed at North Branch Correctional Institution, filed this action on February 19, 2018. ECF No. 1 at 4; *see also Houston v. Lack*, 487 U.S. 266, 270-72 (1988) (discussing prison mailbox rule). He alleges that he dislocated his left shoulder on January 15, 2018. *Id.* The following day, he saw Defendant Doctor Ashraf, who ordered that Plaintiff undergo an x-ray. *Id.* Plaintiff states that he "was not given any results" following the x-ray procedure. On January 19, 2018, Plaintiff was informed that the x-ray revealed "no change" when compared with a previously-taken x-ray and thus Plaintiff had was not "sent to the hospital yet or given any pain medication." *Id.*[2] Plaintiff reports that the refusal to send him to the hospital or provide him with pain medication remained ongoing as of his filing of this instant Complaint on February 19, 2018. *Id.* Plaintiff also asserts that Defendants have failed to comply with the instructions of an emergency room doctor "to follow up with an orthopedic surgeon," though he does not provide details about this instruction (such as when it was issued, the identity of the doctor, the time frame for follow-up, etc.). *Id.* at 5

Plaintiff, who reports that he has "had 5 surger[ies] to correct this problem [of shoulder dislocations]" complains that medical providers are refusing to treat him because they claim he is deliberately dislocating his shoulders. *Id.* at 4-5. In particular, he states that Defendant Doctor Joubert-Curtis told other prison medical staff "to never see [Plaintiff] for this problem" because the problem is self-inflicted, and that Defendant Nurse Pierce "told [him] to live with it" and that

---

[2] Throughout this memorandum opinion, the Court has modified the some of the capitalization when quoting from Plaintiff's filings in order to conform with ordinary writing convictions. These capitalization modifications are not otherwise acknowledged, though all other modifications are acknowledged.

medical providers "were not going to keep sending [him] out" to the hospital to address his recurring shoulder dislocations. *Id.*

Plaintiff complains that the untreated dislocation is causing him pain that is preventing him from being able to sleep. *Id.* at 5. He also states that he is depressed because he feels he is being treated unfairly by the medical staff. *Id.*

In addition to the issue of his shoulder dislocation, Plaintiff states that he suffers from Hepatitis C and is receiving inadequate treatment for this condition. *Id.* Specifically, he claims

> The state knew about this [diagnosis of Hepatitis C] for 5 months now[.] I have high levels with a swollen liver[;] not once has a doctor check on me to see if my liver is still swollen [or] if my levels got higher. . . . I have been having hot cold sweats, fever, fatigue, nose bleeds and my organs ache at night.

*Id.*

## B. Defendants' Exhibits

### (1) Shoulder Injury

In support of their dispositive Motion, Defendants have submitted Plaintiff's medical records, dating back to September 2017. ECF No. 16-3. Defendants have also included an entry in Plaintiff's medical history dated June 16, 2017, that summarizes Plaintiff's history of "recurrent bilateral shoulder dislocations" including eight dislocations between November 2016 and June 2017. *Id.* at 3. It was also noted that, during his two prior terms in prison collectively totaling 23 months' imprisonment, Plaintiff suffered 12 dislocations and underwent 3 "ORIF" or open reduction surgical procedures.[3] *Id.* at 3.

---

[3] According to Johns Hopkins Medicine's Online Health Library,

> Open reduction and internal fixation (ORIF) is a type of surgery used to stabilize and heal a broken bone. . . . During an **open reduction**, orthopedic surgeons reposition the pieces of your fractured bone surgically so that your bones are back in their proper alignment. In a **closed reduction**, a doctor physically moves the bones back into place without surgically exposing the bone.

The June 16, 2017 entry further stated

> Pt admitted on 6/12/17 to being caught cheeking opioid pain medications in DOC around 2009. As per previous visit by ortho on-site, pt has a chronic sublaxation[4] which is manipulated by the patient for secondary gain, (i.e., to go to hospital or to get a narcotic). Per note from 9/13/11, patient was caught self-applying tourniquet to cause edema/loss of circulation to left arm s/p left shoulder surgery. In note from 11/7/11, Dr. Hassan was contacted about further surgery. The patient told a provider that he could dislocate his shoulders at-will. Dr. Hassan, in note from 11/7/11, recommended no further surgery as surgery cannot prevent voluntary shoulder dislocations. . . . Pt seen by nursing, custody previously not wearing sling as advised.

*Id.* (emphasis omitted).

On September 1, 2017, Plaintiff was transferred from the Department of Corrections' Metropolitan Transition Center (MTC) infirmary to the University of Maryland Medical Center (UMMC) for a treatment of a left shoulder dislocation, which Plaintiff had been suffering from for several weeks. *Id.* at 6-8. At UMMC, Plaintiff's "shoulder was reduced under sedation." *Id.* at 10.

Plaintiff was discharged from UMMC the same day. *Id.* Prison health providers reported that Plaintiff's discharge note from the hospital stated that "patient [l]igaments are not strong enough to keep the shoulder in joint. Patient is to keep his shoulder in the sling and to avoid exercise." *Id.* Plaintiff was monitored in the infirmary for a day following his discharge but voiced no concerns. *Id.* at 12.

---

**Internal fixation** refers to the method of physically reconnecting the bones. This method uses special screws, plates, wires, or nails to align the bones correctly. This prevents the bones from healing abnormally. The entire operation usually takes place while you are asleep under general anesthesia.

Arm Fracture Open Reduction and Internal Fixation, *available at* https://www.hopkinsmedicine.org/healthlibrary/ test_procedures/orthopaedic/arm_fracture_open_reduction_and_internal_fixation_135,311 (emphasis in original) (last visited Apr. 1, 2019).

[4] A subluxation is a partial dislocation and describes the condition where "the head of the upper arm bone (humerus) is partially out of the socket (glenoid)." George S. Athwal, American Academy of Orthopaedic Surgeons, Dislocated Shoulder, *available at* https://orthoinfo.aaos.org/en/diseases--conditions/dislocated-shoulder/ (last updated Oct. 2017). A dislocation describes the condition where the humerus bone is completely out of the socket. *Id.*

4

Later the same month, Plaintiff was in the MTC infirmary with a left shoulder dislocation and repeatedly demanded that he be prescribed oxycodone for his pain. *Id.* at 15-18. Medical providers told him that his condition did not warrant oxycodone, and that his existing prescriptions for Tylenol-codeine and Ultram[5] were adequate to address his pain. *Id.*

Plaintiff's medical records indicate that in late September and early October 2017 prison medical providers were having difficulty getting outside orthopedic specialists to treat Plaintiff due to his history with multiple providers and the risk of serious complications based on Plaintiff's numerous past procedures. *Id.* at 19-22, 25. For example, on September 28, 2017, Plaintiff had a scheduled appointment with an orthopedic specialist at Johns Hopkins Hospital (JHH) regarding his dislocation; however, the provider did not treat Plaintiff and instead advised that Plaintiff be returned to UMMC, where his recent reduction had been performed. *Id.* Notes from September 28 stated that Plaintiff continued to cause problems to his shoulders by ignoring post-surgical instructions regarding movement and exercise, and that he was frequently observed without his arm sling. *Id.* at 19, 21, 34.

On October 16, 2017, an x-ray was taken of Plaintiff's left shoulder at Towson Orthopedic Associates; the evaluating doctor indicated that it was impossible to tell what caused the serious instability in Plaintiff's arm and opined that an open reduction would likely be necessary "to get his should back in[to]" place. *Id.* at 36-37.

On October 22, 2017, while attempting to take a shower, Plaintiff called for help and was discovered on the bathroom floor. Plaintiff reported that he had fallen. *Id.* at 42-43. Someone

---

[5] Tramadol is an opiate analgesic that "is used to relieve moderate to moderately severe pain." U.S. Nat'l Library of Medicine MedlinePlus (hereinafter "MedlinePlus"), *Tramadol*, *available at* https://medlineplus.gov/druginfo/meds/a695011.html (last visited Apr. 1, 2019). Ultram is one of the brand names for this drug. *Id.*

5

called 911 and Plaintiff was taken to JHH. *Id.* at 43-45. At JHH, Plaintiff underwent a closed reduction on his right shoulder before his right arm and shoulder were "placed into a sling & swath which the patient should maintain at all times." *Id.* at 46-47. It was noted that the left shoulder was "not amenable to closed reduction" and recommended that Plaintiff follow up with UMMS about surgical options. *Id.* at 46. Doctors at JHH performed CT scans and x-rays on Plaintiff's shoulders and surrounding areas (e.g., spine, humerus bones, etc.). *Id.* at 48-53. Both shoulders were noted to be subluxed, but the images were reported to be substantially similar to images from earlier years. *Id.* at 50-53.

Once Plaintiff returned to the MTC infirmary, providers noted Plaintiff's bilateral shoulder subluxation "with degenerative changes & chronic Hill-Sachs deformity," observed that Plaintiff was wearing an arm sling, and planned to resume the same treatment plan as before Plaintiff's October 22 fall. *Id.* at 54-56. On October 26, 2018, it was noted that Dr. Craig Mathew of St. Joseph Hospital was willing to perform a procedure on Plaintiff's left shoulder provided that Plaintiff undergo an MRI; a consultation request for that MRI was placed. *Id.* at 58. However, Plaintiff's medical records also reported that multiple other orthopedic surgeons were unwilling to perform the procedure because they believed he should see the surgeon who performed surgery "on the same joint, in 2009." *Id.*

On October 27, 2017, Plaintiff reported that a correctional officer pulled his right arm and dislocated it, but an x-ray was performed on the arm a few days later and revealed no change from the x-ray taken at JHH on October 23, 2017. *Id.* at 60, 63, 66.

Between November 2 and November 15, 2017, Plaintiff was housed at the infirmary at Eastern Correctional Institution (ECI). *Id.* at 89. During his time there, Plaintiff "admitted to [a] provider that in the past he would intentionally dislocate his shoulder but stopped d[o]ing that after

his surgeries and due to the chronic pain and restrictive movement." *Id.* at 66. Despite the results of the x-ray indicating that Plaintiff's right shoulder was unchanged compared with the October 27 incident, Plaintiff continued to insist that his right shoulder had been dislocated by the correctional officer and requested that the shoulder be reduced. *Id.* at 68, 74, 83, 85. He was informed that "on[-]site reduction is not medically indicated due to [his] excessive history of dislocation and repair." *Id.* at 68, 74.

During the roughly two weeks that he was at the ECI infirmary, Plaintiff was observed on several occasions without his sling(s). *Id.* at 72, 79. On several occasions, Plaintiff attempted to reduce the shoulder himself (by banging his shoulder against the wall) despite being instructed not to do so. *Id.* at 72, 74, 76, 83. Although he was already prescribed pain medication including Tylenol-codeine, he repeatedly demanded specific pain medication such as oxycodone and, on some occasions, refused the medication that he was offered. *Id.* at 69, 79, 85. He was frequently reported as being belligerent to staff and refused to be evaluated on multiple occasions. *Id.* at 72, 74, 76, 80.

On November 16, 2017, an MRI was performed on Plaintiff's left shoulder, as requested by Dr. Mathew. *Id.* at 91-92. Notes from the MRI report that Plaintiff appeared to have a "mild inferior subluxation of the humeral head" and characterized this inferior subluxation as "chronic." *Id.* at 92. Defendants have omitted Plaintiff's medical records from November 17, 2017 through December 21, 2017, and it is unclear if Dr. Mathew performed surgery on Plaintiff's left shoulder.

On December 21, 2017, Plaintiff was housed at Jessup Correctional Institution. He fell in the shower, causing his left shoulder to be displaced. *Id.* at 93. Plaintiff was taken to Bon Secours Hospital (BSH) where he underwent an unsuccessful closed reduction on his left shoulder, was prescribed Percocet for pain, and was instructed to follow-up with an orthopedic surgeon in a week

7

with a pending order for an open reduction of the left shoulder. *Id.* at 93, 98-100, 108. Plaintiff was returned to Jessup Correctional Institution/Jessup Regional Hospital (JRH) for observation, where the medical notes made repeated reference to his history of recurrent shoulder dislocations, with providers noting that they suspected the problems were self-induced and for the purposes of getting narcotics or other secondary gain. *Id.* at 95, 100, 106, 110. Notes in Plaintiff's medical record also referenced Plaintiff's failure to wear his sling at all times contrary to instructions, his demands for increased pain medicine, and his belligerence with medical staff. *Id.* at 100, 105, 112.

On January 4, 2018, Plaintiff underwent a successful closed reduction of his left shoulder at BSH. *Id.* at 115-16. Plaintiff informed the surgeon that his shoulder had dislocated because he was trying to do a push-up. *Id.* at 116. According to the surgeon's notes of the procedure, "the arm was manipulated [reduced] and was rotated freely. After this, C-arm was used and then I manipulated the shoulder again. The shoulder itself does not come out." *Id.* Plaintiff was returned to JCI/JRH the same day, where a provider noted that Plaintiff "is very capable of dislocating his shoulder at will as we have seen multiple times." *Id.* at 117. He was prescribed Tylenol-codeine and instructed to wear his sling at all times. *Id.*

The following day, Plaintiff was transferred to the infirmary at Western Correctional Institution (WCI),[6] where he reported that his left shoulder had dislocated again at some point before he arrived there. *Id.* at 119-123. On the morning of January 6, 2018, prison medical providers unsuccessfully attempted to put Plaintiff's left "shoulder back in place," before he was taken to the local emergency room at Western Maryland Health System (WMHS) where a reduction was performed. *Id.* at 125-28. He returned to WCI the same day. *Id.* at 127-28, 133.

---

[6] Based on notes in the medical record, it appears that Plaintiff's ultimate destination was North Branch Correctional Institution, which is located less than a mile away from WCI. However, Plaintiff was temporarily housed at WCI infirmary for a post-surgical monitoring period. *Id.* at 123.

On January 8 or 9, 2018, Plaintiff was transferred from WCI to NBCI. *Id.* at 134, 136. However, upon arrival, Plaintiff complained of "left shoulder trauma that just occurred while he was transferred to NBCI." *Id.* at 136. Plaintiff requested that he be provided with Tramadol for pain; Defendant Dr. Mahboob Ashraf informed Plaintiff that he "will get pain medication but not Tramadol." *Id.* at 142 (some capitalization altered). On January 9, 2018, Plaintiff's left shoulder was x-rayed on Dr. Ashraf's orders. *Id.* at 139-40. The radiologist reported that "[t]here is inferior subluxation of humeral head and shoulder joint. There are two metallic screws in glenoid. There is no evidence of an acute fracture." *Id.* at 140. The radiologist also reported that the subluxation was unchanged compared with an x-ray of Plaintiff's left shoulder taken June 6, 2017. *Id.*

On January 10, 2018, Dr. Ashraf submitted a non-formulary drug request for Plaintiff to receive Gabapentin[7] for pain for 30 days. *Id.* at 145-46.[8] Also on January 10, Plaintiff was to receive an injection of Toradol for pain, but he informed providers that he was allergic to the medication. *Id.* at 148.

On January 11, 2018, Plaintiff was again taken to WMHS where another closed reduction of his left shoulder was performed, and he was returned to NBCI the same day. *Id.* at 153, 156. He was instructed by medical providers at WMHS to take Motrin as needed for pain. *Id.* at 153. No new medications were prescribed, nor did WMHS providers write a prescription for any medication that Plaintiff had been taking. *Id.* at 154-55. After returning to NBCI, Plaintiff complained of shoulder pain but refused to take Motrin, insisting that he was supposed to be given Ultram or a stronger pain medication. *Id.* at 156.

---

[7] Gabapentin can be used to treat seizures and certain types of physical pain. MedlinePlus, *Gabapentin, available at* https://medlineplus.gov/druginfo/meds/a694007.html (last visited Apr. 1, 2019). Neurontin is one of the brand names for this drug. *Id.*

[8] Ashraf submitted a request for a two-week supply of Gabapentin the following day which was approved, however, the medical record suggests that the earlier 30-day request was the request that was given effect. *See id.* at 186, 188, 197 (noting that Plaintiff was to receive Neurontin between January 10 and February 10).

On January 12, 2018, Plaintiff had an appointment with Defendant Dr. Joubert-Curtis. He stated that he was supposed to be provided with Ultram, but Joubert-Curtis said that medication was not appropriate to address long-term shoulder dislocation. *Id.* at 168. Joubert-Curtis reviewed Plaintiff's medical records, noting his history of dislocations and repeated hospital visits, as well as a prior doctor's note that Defendant could dislocate his shoulders at will. *Id.* at 168, 173. Therefore, Joubert-Curtis placed the following order in Plaintiff's medical record: "Provider discussed [Plaintiff's medical history] with ortho consultant who agrees that with recurrent self dislocations, patients can generally reduce the shoulders themselves. He is not to return to [Emergency Department] unless there is clear evidence of compr[o]mise to the limb." *Id.* at 168 (capitalization altered).

On January 15, 2018, Plaintiff "got hurt in his cell." ECF No. 16-3 at 179. At an appointment with Dr. Ashraf the following day, Plaintiff reported that his left shoulder was dislocated, presumably as a consequence of getting hurt on January 15, and he insisted that he should be sent to the emergency room. *Id.* at 175. Ashraf prescribed a week's supply of Tramadol (in addition to the Gabapentin he was already receiving) and ordered that Plaintiff's left shoulder be x-rayed to determine if it was dislocated or fractured. *Id.* at 175-79. The radiologist compared the results of the January 16 x-ray with the January 9 x-ray, and reported that there was no change. *Id.* at 182. As with the January 9 x-ray, the radiologist described the findings of the January 16 x-ray as an "inferior subluxation of humeral head and shoulder joint. There are two metallic screws in glenoid. There is no evidence of an acute fracture." *Id.*

On January 19, 2018, Nurse April Kiser reported that Plaintiff "was verbally abusive to [her] and refused to take his medication and refused to give medication[s] back after not taking them." *Id.* at 183. On January 21, Plaintiff filed a sick call slip stating that his shoulder had been

dislocated for six days and that he had not been provided medical treatment during this time period. *Id.* at 184. Plaintiff further reported that Dr. Joubert-Curtis "denied [his] order for pain meds." *Id.* at 185.

On January 24, 2018, Plaintiff was seen by Nurse Stacie Mast after correctional officers reported that they had discovered him unresponsive. *Id.* at 186-87. Plaintiff reported that "he was trying to place his left shoulder back into place and thinks he passed out," and requested that he be sent to the hospital for his shoulder. *Id.* at 186. The notes of this appointment state that Ashraf talked to "Bill Beeman RN and patient not to be sent out per Dr. Joubert MD orders." *Id.* A plan for Plaintiff to be referred to a provider for further evaluation was recorded. *Id.* Later the same day, Plaintiff had an appointment with Defendant Nurse Holly Pierce. Pierce reported that Plaintiff "entered the room demanding Ultram for pain.[9] He was loud and argumentative. The visit was stopped for safety concerns." *Id.* at 188.

On January 30, 2018, Plaintiff filed another sick call complaining that his left shoulder was still dislocated and that he was not being provided with any pain medications; Plaintiff reported that he was no longer receiving Ultram (Tramadol) or Neurontin (Gabapentin). *Id.* at 190-91. Plaintiff acknowledged that his medical record contained past references to "opiate addition" and "drug seeking behavior," but stated that such references "should be ignored." *Id.* at 191. He demanded that he be provided with pain medicine or sent to the hospital for a shoulder reduction. *Id.*

On February 1, 2018, Plaintiff was seen by Nurse Mast; Plaintiff informed Mast that his left shoulder was dislocated and requested that he be provided pain medication or be sent to the hospital. *Id.* at 192. Mast noted that Plaintiff exhibited no loose movement of his left arm or

---

[9] According to Plaintiff's medical records, his 7-day prescription for Tramadol expired on the same day. *Id.*

shoulder and that, although he claimed he was unable to move his left arm, both of Plaintiff's arms were cuffed behind his back "without any issue." *Id.* Mast ordered that Plaintiff be referred to a provider for an evaluation of his medications. *Id.* Later the same day, Mast noted on Plaintiff's January 30 sick call that Plaintiff was "on naproxen, Neurontin, Robaxin[10]," which contradicted Plaintiff's claim that he was not receiving Ultram or Neurontin. *Id.* at 190; *see also id.* at 192 (reflecting same on medical record).

On February 4, 2018 Plaintiff filed another sick call demanding that he be provided with pain medication or that his shoulder be "put back in place." *Id.* at 194-95. The following day,[11] Plaintiff submitted another sick call, reporting that his left shoulder remained dislocated and that his left hand was numb. *Id.* at 198. Plaintiff stated that Joubert-Curtis "is gone" and thus other providers including Pierce should disregard Joubert-Curtis' earlier instructions that Plaintiff not be sent to the hospital. *Id.* at 198-99. Plaintiff noted that "Holly [Pierce] told me to just 'live with it' on our last visit[.] I really hope they have have [sic] to amputate my left hand do [sic] to your medical negligence." *Id.* at 199.

Also on February 5, 2018, Plaintiff was evaluated by a mental health provider. *Id.* at 196. The provider noted that Plaintiff "has active meds for Neurontin and Naproxen, but he states that although his Neurontin is active through 2/10/18 he has not received it since 2/5/18. He also states that also Naproxen is active (KOP orders) he has already consumed them all as well as 800 mg Motrin." *Id.*

---

[10] Robaxin is a brand name for the drug Methocarbamol, a medication used "to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." MedlinePlus, *Methocarbamol, available at* https://medlineplus.gov/druginfo/meds/a682579.html (last visited Apr. 1, 2019).

[11] Although this sick call is not dated, Plaintiff stated that his shoulder had been dislocated for 22 days. *Id.* at 198. In sick call dated February 4, 2018, Plaintiff stated that his shoulder had been dislocated for 21 days. *Id.* at 194.

On February 9, 2018, Plaintiff had an appointment with Dr. Ashraf regarding his shoulder pain. Ashraf reported that, although Tramadol had been ordered for Plaintiff he did not receive it; therefore, Ashraf submitted a request for this medication. *Id.* at 200. Ashraf also prescribed Tegretol for pain and ordered that Naproxen be discontinued as it was not reducing Plaintiff's pain. *Id.*

In an undated sick call that was received by prison officials on February 13, 2018, Plaintiff acknowledged that he was receiving pain medication, but nonetheless demanded that his shoulder be reduced. *Id.* at 203-04.

On February 14, 2018, Plaintiff was seen by Nurse Mast. *Id.* at 207. Mast noted that Plaintiff reported "continued pain with his left shoulder and request[ed] different medication," and she referred him to a provider for medication issues. *Id.* She noted that Plaintiff reported being unable to move his left shoulder due to the pain, but she observed no swelling, bruising, or problems with front-cuffing. *Id.*

Plaintiff submitted the instant Complaint on February 19, 2018. ECF No. 1 at 4. Several weeks after Plaintiff filed his Complaint, Dr. Getachew submitted a consult request for Plaintiff to receive orthopedic surgery on his shoulder. ECF No. 16-3 at 217-19. On March 19, 2018, Plaintiff underwent closed reduction surgery on his left shoulder at BSH. *Id.* at 224.

Defendants also filed an affidavit from Dr. Getachew, the acting regional medical director, who reviewed Plaintiff's medical records. ECF No. 16-4 at 1. Getachew averred that, in his medical opinion, Plaintiff received appropriate medical care and treatment from Defendants and other medical providers regarding his shoulder dislocations and shoulder pain. *Id.* at 13. Moreover, as to Joubert-Curtis' decision that Plaintiff would not be sent to the hospital "for his chronic dislocations unless there was evidence of neurovascular limb compromise," Getachew

averred that, in his medical opinion, "this was an appropriate treatment plan given Plaintiff's medical history and well-documented use of his shoulder injuries for secondary gain." *Id.* at 10

### (2) Hepatitis C

The first reference to Hepatitis C in the medical records before the Court appears in Plaintiff's laboratory results dated October 6, 2017, which reported that Plaintiff was positive for the virus. *Id.* at 23-24. On October 20, 2017, Doctor Ali submitted a consultation request for Hepatitis C treatment consideration. *Id.* at 38, 40. On November 8, 2017, Nurse Practitioner Cyran resubmitted the consultation request regarding Plaintiff's Hepatitis C. *Id.* at 74-75.

On January 12, 2018, Joubert-Curtis submitted a consultation request asking that Plaintiff be evaluated for Hepatitis C treatment. *Id.* at 171. She noted that "the LFTs are elevated and viral load 5.6 mil." *Id.* In a sick call received by prison officials on February 17, 2018, Plaintiff complained that he was not receiving treatment for Hepatitis C, alleging that he had experienced "chest pains[,] light headed[ness], fatigue, hot cold sweats" and that he had a swollen liver. *Id.* at 209.

On February 19, 2018, two days after his sick call was received, Plaintiff filed the instant Complaint. ECF No. 1 at 4. On February 20, 2018, Plaintiff was seen by Registered Nurse Lease based on his complaints for Hepatitis C treatment and educated as to the process for getting treatment. *Id.* at 211. On March 22, 2018, Licensed Nurse Practitioner Travis Barnhart prepared a "[w]ork up for HCV panel presentation." *Id.* at 226.

According to an affidavit from Dr. Getachew dated March 26, 2018, "it is expected that Plaintiff will receive a liver Fibroscan" within the next two months and prior to presentation of his case to the HCV panel. ECF No. 16-4 at 19. Getachew further noted that "Plaintiff continues to

be regularly monitored for his HCV as a chronic care patient and Plaintiff has more immediate access to medical staff through the sick call process." *Id.*

## C. Plaintiff's Opposition

Plaintiff filed a Response in Opposition, in which he avers that he has "never dislocated [his] shoulder on purpose for secondary gain for narcotics or hospital trips therefore Defendants have no reason to ignore Plaintiff['s] shoulder dislocation." ECF No. 25 at 7. Plaintiff's Response also takes issue with Defendants' use of words like "believed" and "consistent with" when describing the notion that Plaintiff's shoulder injuries are self-inflicted asserting that Defendants have offered "no proof" to establish that their suspicions are factually correct. *Id.* at 1-2.

### STANDARD OF REVIEW

Defendants' dispositive Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify

parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Defendant has filed and relied on declarations and exhibits attached to her dispositive motion, the motion shall be treated as one for summary judgment.

Summary judgment is governed by Rule 56(a), which provides in relevant part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Fed. R. Civ. P. 56(e)). Because Plaintiff is proceeding pro se, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## ANALYSIS

### A. Deliberate Indifference

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[D]eliberate indifference requires more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 696 (internal quotation marks omitted).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate

in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06; *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000).

The Court does not suggest that plaintiff is not entitled to medical treatment for his medical conditions. The right to treatment, however, is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir.1977). Moreover, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 419 U.S. at 105–06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.1985).

(1) Shoulder Injury

Plaintiff's claim that Defendants were deliberately indifferent to his shoulder is threefold: he claims that Defendants failed to send him to the hospital for treatment based on Defendant Joubert-Curtis' assessment that Plaintiff was capable of voluntary dislocation, that Defendants did not provide him with pain medications after his reported dislocation on January 15, 2018, and that Defendants failed to ensure that he went to a follow-up appointment with an orthopedic surgeon. ECF No. 1 at 4-5. The Court addresses these claims in turn.

First, Plaintiff claims that Defendants were deliberately indifferent to his medical needs by refusing to send him to the hospital for his shoulder injury based on their belief that Plaintiff was voluntarily dislocating his shoulder for secondary gain. *Id.* at 4. He argues that Defendants have "no proof" to support their belief and insists that he has never "dislocated his shoulder on purpose for secondary gain." ECF No. 25 at 1, 7.

Defendants do not dispute that a dislocated or subluxated shoulder is an objectively serious medical condition. Rather, the relevant question here is whether Defendants' decision not to send Plaintiff to the hospital following his January 15, 2018 injury amounted to a reasonable response. *See Farmer*, 511 U.S. at 844. Although Plaintiff would undoubtedly like the Court and Defendants to view his shoulder injury and complaints of pain without the context of his medical history, *see* ECF No. 25 at 1 (faulting defendants for filing "excessive medical records for no apparent reasons"), such information—which was known to Defendants at the time—is relevant to evaluating whether Defendants' actions were reasonable.

According to the medical records, Defendants believed that Plaintiff was voluntarily injuring his shoulder for secondary gain, and therefore concluded that continually sending him to the hospital for reduction would not eliminate the harm and, indeed, might only encourage continued injury. ECF No. 16-3 at 168. Defendants have offered ample evidence to support their

belief. For example, multiple medical providers including those outside the prison have suggested that Plaintiff is capable of intentionally dislocating his shoulder and have refused to treat him because of his medical history. ECF No. 16-3 at 3, 19, 21, 25, 106, 117. Further, Plaintiff was observed on multiple occasions refusing to comply with less invasive medical instructions designed to ameliorate his shoulder injury. Primarily, this took the form of Plaintiff not wearing his sling or engaging in physical exercise that exacerbated his injury. *See* ECF No. 16-3 at 3, 21, 34, 72, 79, 105 (noting instances that Plaintiff was observed without medically advised sling); *id.* at 19, ("despite medical advi[c]e, inmate continues to cause motions/ movement to dislocate joint"), *id.* at 19, 37, 116 (noting that Plaintiff re-injured his shoulder on one occasion by doing push-ups and on another occasion by lifting weights). Plaintiff has also demanded specific (usually opioids) or additional drugs to treat his pain, has occasionally refused to take other types of medication when his demands are not met, which the medical records state is indicative of drug-seeking behavior, and has admitted "cheeking" medications in the past. *Id.* at 3, 15, 18, 68, 79-80, 85, 100, 114. Moreover, although not specifically relied on by the Defendants, Plaintiff's medical records establish that, in the two weeks preceding the January 15 injury, Plaintiff was sent to the hospital on three separate occasions and underwent a closed reduction procedure each time; within 96 hours of each hospital visit, Plaintiff had re-injured his shoulder. *Id.* at 115-75. This suggests that Plaintiff's desired result of being sent to the hospital after his January 15 injury may have been a futility.

Given the above evidence, the Defendants have demonstrated that they acted reasonably in deciding not to send Plaintiff to the hospital after his January 15 injury given the ample evidence known to Defendants at the time that suggested an intentional dislocation for secondary gain. Rather than send Plaintiff to the hospital, the Defendants continued to monitor Plaintiff through

20

medical appointments and x-rays and to provide him with pain medication, as discussed in more detail below. *Id.* at 175-83, 186, 192, 200-01, 207-08. Although Plaintiff insists that he has never dislocated his shoulder for secondary gain, the Eighth Amendment does not require Defendants to take this statement at face value and disregard all the observations and evidence to the contrary.

Turning to Plaintiff's related allegation that he was denied pain medication between January 15 and the filing of this Complaint, this claim is plainly belied by the verified medical records, establishing that he was variously prescribed Ultram, Neurontin, Naproxen, Robaxin, and Tegretol for his pain and that medical providers adjusted his medications in response to his complaints. *See id.* at 176-77, 186, 190, 192, 200-01, 206, 207-08 . To the extent that Plaintiff is alleging that he was not provided with certain types of medication, that is merely a dispute about the course of treatment that does not amount to a constitutional claim. *See Estelle*, 419 U.S. at 105–06. Likewise, although Plaintiff's medical record reveals that Plaintiff did not receive his Neurontin prescription for several days in early February, *see* ECF No. 16-3 at 196, Plaintiff does not allege that the named Defendants had any involvement with or knowledge about this omission.

Finally, as to the Plaintiff's assertion that he did not receive a follow-up appointment with an outside surgeon, Plaintiff has provided no details to allow the Court to determine whether the lack of follow-up had any medical significance. Indeed, the complained-of problem is that Plaintiff fell and reinjured his arm after receiving several closed reduction procedures, not that there was anything deficient about the procedures themselves that would have been remedied by a follow-up appointment. Accordingly, he has failed to pled facts suggesting that the denial of an unspecified follow-up appointment rises to the level of a constitutional violation.

(2) Hepatitis C

As to Plaintiff's claim that he did not receive treatment for his Hepatitis C for over five months, he cannot establish the subjective element as to the Defendants named in the instant case. According to the medical records, the first time he had an interaction with any of the instant Defendants was his January 8 (or 9) appointment with Dr. Ashraf, where Plaintiff complained that he had re-dislocated his shoulder. ECF No. 16-3 at 136. Although Plaintiff was seen by each of the three named Defendants between January 8 (or 9) and January 12, the medical records do not suggest that Plaintiff voiced concerns about Hepatitis C during this time, presumably because both Plaintiff and Defendants were primarily focused on Plaintiff's complaints of shoulder dislocation. *See id.* at 142-44 (appointments with Ashraf on January 10 complaining of left shoulder pain); *id.* at 151-52 (appointment with Pierce on January 11, complaining of left shoulder pain); *id.* at 168-70 (appointment with Joubert-Curtis on January 12).

It appears that Joubert-Curtis recognized the concerns about Hepatitis C on January 12, 2018, the first day that she treated Plaintiff, after lab tests revealed abnormal results relevant to the virus. *See id.* at 173. The same day, Joubert-Curtis submitted a consultation request asking that Plaintiff be evaluated for Hepatitis C treatment. *Id.* at 171. Neither Plaintiff nor the medical records suggest that, between the time that Joubert-Curtis submitted the consultation request and the time that Plaintiff submitted the instant Complaint, Plaintiff noted any complaints or concerns about his Hepatitis C treatment to any of the named Defendants. Plaintiff did submit two sick calls complaining about his lack of Hepatitis C treatment, but these were reviewed by other medical providers who are not party to this action. Thus, Plaintiff cannot demonstrate that any of the named Defendants acted with the mental state necessary to support a deliberate indifference claim as to Plaintiff's Hepatitis C.

Moreover, of those two sick calls that Plaintiff submitted regarding his Hepatitis C treatment, one merely reiterated that he had not received treatment but did not identify any symptoms or problems, *id.* at 191, and one complained that he wanted treatment and was experiencing "chest pains, light headed[ness], fatigue, hot cold sweats," *id.* at 209-10. Nurse Lease responded to the second sick call and conducted a physical examination, which revealed vital signs within normal limits and no concerning results. *Id.* at 211, ECF No. 16-4 at 18. Since that time, medical providers have prepared to present Plaintiff's case to the Hepatitis C treatment panel for a possible medication regimen, which Dr. Getachew avers is consistent with DPSCS's Hepatitis C treatment protocol. ECF No. 16-4 at 13-19. Thus, since the time Plaintiff was first seen by the named Defendants, Plaintiff's complaints regarding his Hepatitis C have been adequately responded to by medical providers.

**B. Defendants' Supplemental Motion for Summary Judgment**

On December 14, 2018, Defendants filed a Supplemental Motion for Summary Judgment, submitting evidence that Plaintiff was observed playing basketball on October 18, 2018, despite his claimed shoulder injuries. ECF No. 32. This Supplemental Motion is unnecessary to resolving the case and, in any event, is not pertinent to whether Defendants provided adequate medical treatment to Plaintiff eight months earlier. Moreover, given Defendants' own desire to strictly adhere to the Court's filing rules as evidenced by its prior Motion to Strike Plaintiff's supplemental filing as an unauthorized surreply, it is hypocritical of Defendants to file unauthorized pleadings without first seeking leave of the Court. Accordingly, the Supplemental Motion for Summary Judgment shall be terminated.

**CONCLUSION**

For the reasons stated above, Defendant X-Ray Radiologist is dismissed and the remaining Defendants' dispositive Motion, construed as a Motion for Summary Judgment, is granted. Defendants' Supplemental Motion for Summary Judgment shall be terminated. A separate order follows.

_April 4, 2019_
Date

_Pll D. Bntt_
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE